IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, *ex rel.*
NEW MEXICO SOCIETY FOR
ACUPUNCTURE AND ASIAN MEDICINE,

    Plaintiff/Counterdefendant,

v.                                                           No. 1:17-cv-00250 JCH/SMV

KINETACORE HOLDINGS, LLC,
EDO ZYLSTRA, KERI MAYWHORT,
JOHN AND JANE DOES,

    Defendants/Counterclaimants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court following its denial of Plaintiff's motion for a temporary restraining order that sought to enjoin Defendants from conducting a seminar on "dry needling" in February 2017. In response to a later show cause order by the Court requesting explanation from the parties for why the case should not be dismissed, Plaintiff indicated that it sought to permanently enjoin Defendants from engaging in the future practice of dry needling and in the unauthorized practice of medicine without a license. For their part, Defendants responded that they were evaluating whether to file counterclaims and, in an amended answer, Defendants did indeed counterclaim against Plaintiff two violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2 (2018) for allegedly bringing "sham" litigation for anticompetitive purposes.

Now pending are the parties' cross-motions for summary judgment on Plaintiff's claim for injunctive relief and Plaintiff's motion to dismiss the antitrust counterclaims. The material

facts are undisputed. According to Plaintiff, its partial motion for summary judgment[1] presents a "narrow legal question": whether dry needling falls within the definition of "physical therapy" contained within N.M. Stat. Ann. § 61-12D-3(I) (2016), which is New Mexico's statute defining the practice of physical therapy. After careful consideration of the motions, briefs, evidence, and relevant law, the Court concludes that Plaintiff's Motion to Dismiss [Doc. 30] should be granted; its Motion for Partial Summary Judgment [Doc. 40] should be denied; and that Defendants' Motion for Summary Judgment [Doc. 73] should be granted.

I.  BACKGROUND

Defendant Kinetacore is a company that teaches dry needling. Doc. 73, ¶ 1. Defendant Maywhort is a lead course instructor with Kinetacore and Defendant Zylstra is its Chief Executive Officer. Doc. 40, ¶¶ 1, 3. Defendants are not licensed physicians. *Id*. ¶ 4. Dry needling refers to a technique "used by physical therapists that uses a thin filiform needle to penetrate the skin and stimulate underlying my fascial trigger points, muscular, and connective tissues for the management of neuromusculoskeletal pain and movement impairments." Doc. 73, ¶ 2. Stated simply, dry needling is practiced by physical therapists and involves inserting needles into a person's muscles to release trigger points and relieve pain. Doc. 40-2. The needles used in dry needling are the same type of needle used for acupuncture. Doc. 40-3, p. 1. Acupuncturists and physical therapists are separately regulated.

New Mexico regulates the practice of physical therapy under N.M. Stat. Ann. §§ 61-12D-1 to -19 ("Physical Therapy Act" or "the Act"). The Act creates a physical therapy board ("the

---

[1] At oral argument on its motion to stay discovery, Plaintiff explained to Judge Vidmar that its motion for summary judgment, although titled "partial" would in fact resolve the entirety of Plaintiff's claim for permanent injunctive relief. Plaintiff titled the motion "partial" because it does not address Defendants' counterclaims, which are the subject of Plaintiff's separate motion to dismiss. *See* Doc. 64.

Board") whose powers and duties include "regulat[ing] the practice of physical therapy by interpreting and enforcing the provisions of the" Act, *see* § 61-12D-5(B), and "may adopt, file, amend or repeal rules and regulations … to carry out the" Act. *Id*. § 61-12D-5(C). The Board consists of five members appointed by the governor, three of whom are physical therapists. *Id.* § 61-12D-4.

Eighteen years ago, in 2000, the Board reflected its opinion in a letter that "the [Physical Therapy] Act does not prohibit dry needling." Doc. 40-4. The Board's 2000 opinion was in response to a complaint regarding one of its practitioner's "training in dry needling for triggerpoint therapy." Doc. 40-4. After reviewing the complaint the Board wrote in its letter that it was closing the case against the practitioner because "[t]he [Physical Therapy] Act does not prohibit dry needling." Doc. 40-4. Plaintiff argues that the Board's 2000 opinion letter is doubtful in light of an August 2014 Board meeting between the Board and its legal counsel. Counsel told the Board that physical therapy did not include dry needling, since "[n]othing [in the physical therapy scope-of-practice statute] seems to contemplate penetrating the skin in any way, shape or form." Doc. 40-4, p. 3, 39:17-18. However, there is nothing in the record or from the 2014 meeting transcript indicating that the Board changed its position since the 2000 opinion letter.

The Board's 2000 opinion letter's statement that "[t]he [Physical Therapy] Act does not prohibit dry needling" in response to a complaint about one of the Board's practitioner's training is the Board's sole pronouncement on the issue. The record does not show that the Board has adopted any formal regulations addressing whether dry needling is within a physical therapist's scope of practice.

Boards of Physical Therapy or Attorneys General of several other states have also addressed whether dry needling falls within the profession's scope of practice, but states are divided on the issue. For instance, in his opinion addressing the issue, the Attorney General of Nebraska noted that "[w]hile there is a split of authorities from other jurisdictions on this question," a majority of five state Attorneys General "have concluded that dry needling may be within the scope of practice for physical therapists and that the board of physical therapy for that state has authority to make that determination." Neb. Op. Att'y Gen. No. 16009, 2016 WL 3682982 at *4 (July 8, 2016). *Cf.* N.J. Op. Att'y Gen. No. 13-0024, n. 1 (2017), Doc. 40-4, p. 13 (stating that "[a]t least five states have issued opinions suggesting that dry needling may be within the scope of practice of a physical therapist and at least six states, …[] have either Attorney General or Board determinations that indicate the [sic] physical therapists cannot engage in dry needling.")

According to Plaintiff, the Board's 2000 opinion letter flatly contravenes New Mexico's physical therapy scope-of-practice statute because dry needling it is not an expressly mentioned practice and because the New Mexico Legislature intended to restrict physical therapists' practice to non-invasive therapeutic practices. Defendants argue that the Board's letter is entitled to substantial deference and that the Act permits dry needling. Additional facts and argument will be provided as needed in the sections that follow.

## II. CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. LEGAL STANDARDS

#### i. Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248–50. An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013). In analyzing cross-motions for summary judgment, a court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016). "Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030 (10th Cir. 2007).

      ii.        **Statutory Injunction**

"In cases where the governing statute specifically authorizes injunctive relief—a 'statutory injunction'—the statute controls." *United States v. High Plains Livestock, LLC*, 148 F. Supp. 3d 1185, 1202 (D.N.M. 2015), *overruled on other grounds by,* No. 15-CV-680 MCA/WPL, 2016 WL 10591975 (D.N.M. Jan. 11, 2016). "A statutory injunction is available where a statute bans certain conduct or establishes certain rights, then specifies that a court may grant an injunction to enforce the statute." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1098 (11th Cir. 2004). Thus, "[w]here an injunction is authorized by statute it is unnecessary for plaintiff to plead and prove the existence of the usual equitable grounds, irreparable injury and absence of an adequate remedy at law. It is enough if the requirements of the statute are satisfied." *Atchison, T. & S. F. Ry. Co. v. Lennen*, 640 F.2d 255, 260 (10th Cir. 1981). "[T]he standards for granting statutorily-authorized injunctions are necessarily controlled by the statute itself. *Klay*, 376 F.3d at 1098. New Mexico state courts seem to follow the same rule. *See Sec'y,*

5

*Taxation & Revenue Dep't v. Carter*, No. 29,979, 2012 WL 868895, at *3 (N.M. Ct. App. Feb. 16, 2012).

Here, Plaintiff seeks a statutory, rather than equitable, injunction under N.M. Stat. Ann. § 61-6-22, which authorizes courts to enjoin an unlicensed medical practitioner. In order to obtain injunctive relief, the statute requires Plaintiff to prove, at a minimum that Defendants "did, on a certain day and in a certain county, engage in the practice of medicine without having a valid license." § 61-6-22. The parties agree that Defendants' held a seminar on February 25-26, 2017 in Bernalillo County at which dry needling was performed and taught, but disagree about whether that constituted the unauthorized practice of medicine without a license.

B. ANALYSIS

    i. **Whether the Board's 2000 Opinion Letter Receives Deferential Judicial Review**

As a threshold matter, the parties heavily dispute whether the Board's 2000 opinion letter is binding guidance entitled to deferential judicial review, necessitating the Court's analysis of that issue. Plaintiff argues that the letter is entitled to little or no deference because it is mere informal advice the Board gave to one of its practitioners but is not a Board regulation interpreting the Act. "Different types of agency pronouncements are entitled to different degrees of deference." *Newton v. FAA,* 457 F.3d 1133, 1136 (10th Cir.2006). "When an agency construes a statute that governs it, the court will accord some deference to the agency's interpretation." *Marbob Energy Corp. v. New Mexico Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 6, 146 N.M. 24, 27, 206 P.3d 135, 138. "In contrast, statutory "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement

guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."[2] *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1271–72 (10th Cir. 2007); *accord Doe v. Santa Clara Pueblo*, 2007-NMSC-008, ¶ 41 n.7, 141 N.M. 269, 154 P.3d 644. "Such interpretations are 'entitled to respect' ..., but only to the extent that those interpretations have the 'power to persuade.'" *Via Christi Reg'l Med. Ctr.*, 509 F.3d. at 1272.

Here, the record shows that the Board has not adopted a regulation addressing whether the Act includes dry needling, and that the 2000 opinion letter was made in response to a complaint about one of the Board's practitioner's training. This likely takes the form of an opinion letter that lacks the force of law and thus not entitled to a high degree of *Chevron* deference. *See Doe*, 2007-NMSC-008 at ¶ 41 n.7 (federal agency letter interpreting state and tribal jurisdiction under Indian Gaming Regulatory Act lacked the force of law because it was not an agency regulation "arrived at after ... a formal adjudication or notice-and-comment rulemaking."); *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1162–63 (10th Cir. 2011) (holding that proposed Securities and Exchange Commission rule lacked force of law because it never resulted in a final rule or regulation); *Newton,* 457 F.3d at 1137 (holding that agency's interpretations of federal regulations were "clearly entitled to *Chevron* deference" whereas agency handbook interpretation of a statute was "entitled to deference to the extent it [was] persuasive.") Therefore, the Court consults the Board's 2000 opinion letter for its persuasive value without affording it the highest level of *Chevron*-style deference. However, as explained in the section that follows, even with a lesser degree of deference given to the opinion letter, the Court still defers to the Board's opinion that the Act permits dry needling because of the Board's

---

[2] In *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 841–44, (1984), the Supreme Court held that courts must defer to an agency's regulation reasonably interpreting an ambiguous statute.

regulatory authority over physical therapy and its expertise in defining terms unique to the profession.

### ii. Whether the Board's Interpretation of the Act is Persuasive

In asking whether the Board's interpretation of the Act was persuasive, no formal set of factors guides the Court's determination. In *Metro. Life Ins. Co.*, the Tenth Circuit found persuasive an informal Securities and Exchange Commission opinion based on factors like the agency's "analysis and interpretation of the statutory history"; "its knowledge of the historical practices of brokers and dealers"; its "particular expertise in" the area; and the overall legislative history of the statute the SEC interpreted. 631 F.3d at 1163. The Court keeps in mind this loose set of factors in evaluating the persuasiveness of the Board's opinion that the Act permits dry needling.

> The Act defines the "practice of physical therapy" as
>
> (1) examining and evaluating patients with mechanical, physiological and developmental impairments, functional limitations and disabilities or other health-related conditions in order to determine a physical therapy diagnosis, prognosis and planned therapeutic intervention;
>
> (2) alleviating impairments and functional limitations by designing, implementing and modifying therapeutic interventions that include therapeutic exercise; functional training in self-care and community or work reintegration; manual therapy techniques, including soft tissue and joint mobilization and manipulation; therapeutic massage; assistive and adaptive devices and equipment; bronchopulmonary hygiene; debridement and wound care; <u>physical agents; mechanical and electrotherapeutic modalities</u>; and patient-related instruction;
> …

N.M. Stat. Ann. § 61-12D-3(I)(2) (emphasis added).

When the New Mexico Legislature passed the Act in 1997 it did not define any terms within the definition of the "practice of physical therapy," especially, as relevant here, the terms "physical agents" and "mechanical and electrotherapeutic modalities." Plaintiff argues that the

8

statute's plain language excludes dry needling as being within the scope of practice for physical therapists because it is not an expressly enumerated practice and it does not fit into a natural reading of any of the practices that compromise physical therapy. Specifically, Plaintiff points out that interpreting § 61-12D-3(I) to permit dry needling would violate three longstanding canons of statutory construction. First, that a statute must be interpreted in accordance with its plain meaning and in a way that effectuates the New Mexico Legislature's intent, *see Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. Second, that under the doctrine of *ejusdem generis*, where a statute contains "general words follow words of a more specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Nick R.*, 2009-NMSC-050, ¶ 21, 147 N.M. 182, 186–87, 218 P.3d 868, 872–73. And third, that a statute should be interpreted "so that no part of the statute is rendered surplusage or superfluous" *State v. Santillanes*, 2001-NMSC-018, ¶ 44, 130 N.M. 464, 481, 27 P.3d 456, 473 (Minzner, J. dissenting).

Thus, Plaintiff argues that the Legislature clearly meant to restrict physical therapists' practice to non-invasive acts, as evidenced by the terms "physical exercise," "therapeutic massage," "manual therapy," etc., all of which are non-invasive in nature. Defendant counters that dry needling can be seen as a "physical agent" and/or "mechanical and electrotherapeutic modality" within the meaning of the Act because a needle is a physical agent and the practice involves occasional use of a mild electric current. Plaintiff complains these interpretations would effectively expand the definition of physical therapy to include almost any type of procedure, and that the Board cannot "pour any meaning it desires into the" Act. Doc. 40, p. 21 (citing *State ex rel. Sandel v. N.M. Pub. Utility Comm'n,* 1999-NMSC-019, ¶ 17, 127 N.M. 272, 980 P.2d 55.)

Plaintiff additionally argues that under the doctrine of *ejusdem generis* terms like "physical agent" and "mechanical and electrotherapeutic modality" refer to things like walkers, weight machines, electronic stimulation pads, and the like. Those things are naturally connected to other words in the statute like "therapeutic exercise," "soft tissue and joint mobilization and manipulation," etc.

The Court concludes that the Board's determination that the Act permits dry needling is highly persuasive and entitled to deference. Although Plaintiff is correct the Board gave no specific legal reasoning for its conclusion (it simply cited to the statute without any analysis), its pronouncement was sufficient given its authority to "regulate the practice of physical therapy by interpreting and enforcing the provisions of the Physical Therapy Act," § 61-12-D-5(B). The Board – three of whom are physical therapists – could have interpreted substantive terms like "physical agent" or "mechanical modality" that likely had a particular meaning to the profession. Numerous other Boards of Physical Therapy or Attorneys General have interpreted identical or similar terms and concluded that dry needling falls within the profession's scope of practice. For example, the Texas Attorney General was asked to address whether Texas's statute, similar to New Mexico's statute, could include the practice of dry needling as "utilization of ... physical agents ..." Tex. Att'y Gen. Op. KP-0082 (2016). In his opinion, the Texas Attorney General stated that the Texas Physical Therapy Board permissibly concluded that physical therapy included dry needling since the practice could involve the "utilization of ... physical agents ... " *Id*.

Similarly, the Attorney General of Nebraska was asked whether the term "mechanical modality," defined as "a method of application or the employment of any therapeutic agent; limited usually to physical agents," could include a needle device. Neb. Op. Att'y Gen. No.

16009 at *3 (July 8, 2016). The term "mechanical … modality" also appears in New Mexico's Act. The Attorney General opined that "a colorable argument [could] be made that dry needling falls within the" terms of Nebraska's physical therapy statute as a "mechanical modality." *Id.* at 5. Other states have found that the definition of similar terms such "mechanical device" or "mechanical means" under those states' physical therapy laws could include acupuncture needles. *See* 95 Md. Op. Att'y Gen. 138, 2010 WL 3547902 *7 (concluding that "[t]he phrase 'mechanical device' appears susceptible to a broad reading" and further and that a needle could be a mechanical device used for "purposes related to physical therapy."); *see also* La. Att'y Gen. Op. No. 14-0216, 2015 WL 1523857 at *5 (concluding that Louisiana's statute defining physical therapy, which included "treatment by mechanical means" was "broad enough to include the use of solid filiform needles"); Miss. A.G. Sept. 10, 2012, 2012 WL 6065221, at *4. The fact that numerous Attorneys General or Physical Therapy Boards from other states have interpreted the same or similar substantive terms to encompass dry needling only strengthens the Court's conclusion that the Board's interpretation of substantive terms unique to the profession is entitled to deference.

Of course, other states have come to the opposite conclusion in reading terms like "physical agent" or "mechanical modality." For instance, Plaintiff points out that the Washington Attorney General's rejected an interpretation of needles as a "physical agent" within the scope of the practice of physical therapy since, as the Attorney General opined, the term "'physical agents' could include medications, but physical therapists are not allowed to prescribe medications." Doc. 40-2, p. 14. *See also* Doc. 40-4 (opinion of the Attorney General of New Jersey that "[i]f a needle is a 'mechanical modality', a scalpel or knife or a laser might also be classified.") Thus, as Plaintiff points out, state and federal courts in Washington and California

11

have enjoined Defendant Kinetacore from practicing dry needling on the ground that those states' scope-of-practice laws for physical therapists did not include dry needling. *See* Docs. 12, Exs. 3-6. Washington's physical therapy scope-of-practice statute in particular is very similar to that of New Mexico's. *See* Wash. Rev. Code § 18.74.010(10)(a)-(e) (2017). Yet courts in that state have found that physical therapy does not include dry needling and have enjoined Kinetacore from teaching the practice there.

But other states' conclusions are certainly less persuasive than the New Mexico Board's own pronouncement that the Act permits dry needling. Where the Board's members – three of whom are presumably experts in physical therapy – have reached such a conclusion, the Court hesitates to disturb that result. *See Perea v. Baca*, 1980-NMSC-079, ¶ 17, 94 N.M. 624, 627, 614 P.2d 541, 544 ("[a]n administrative construction given a statute by the agency charged with its administration is persuasive and will not be lightly overturned.") As in *Metro. Life Ins. Co.*, the Court finds persuasive the Board's conclusion due to its "particular expertise" in defining the substance of terms within the Act. *See* 631 F.3d at 163. Even though the Board's opinion is only persuasive, deference is warranted where, as here, "the legal questions presented implicate special agency expertise … and it appears that the agency has been delegated policy-making authority in the area." *Doña Ana Mut. Domestic Water Consumers Ass'n v. New Mexico Pub. Regulation Comm'n*, 2006-NMSC-032, ¶ 10, 140 N.M. 6, 10, 139 P.3d 166, 170.

Plaintiff additionally argues that because acupuncture is separately and tightly regulated, the New Mexico Legislature never meant to allow physical therapists to use acupuncture needles. It is telling, Plaintiff says, that the Legislature exempted doctors and nurses from having to get an acupuncture license to perform blood-draws, *see* N.M. Stat. Ann. § 61-14A-6(B)(7), but that the Legislature never extended that exemption to physical therapists to perform dry needling.

12

Moreover, Plaintiff notes that it is unlikely that the Legislature would intend that acupuncturists would have to undergo more than 2,400 hours of training and take a detailed exam to obtain their acupuncture license, but permit physical therapists to perform virtually the same technique with only 28 hours of training.

However, this case is not about acupuncturists' scope-of-practice laws and whether dry needling is synonymous with acupuncture. Plaintiff framed its own partial motion for summary judgment as presenting the "narrow legal question" of whether the Physical Therapy Act permits dry needling as expressed in § 61-12D-3(I). The parties agree that the Legislature has given the Physical Therapy Board power to regulate the profession by "interpreting and enforcing" the Act, and the Board is authorized to define the profession's scope of practice. As detailed above, the Board's interpretation is persuasive and entitled to deference. And, that the Legislature has left untouched the Board's 18-year-old interpretation further suggests that it does not contravene legislative intent in the manner Plaintiff describes. *See State ex rel. Stratton v. Roswell Indep. Sch.*, 1991-NMCA-013, ¶ 24, 111 N.M. 495, 503, 806 P.2d 1085, 1093 ("[t]he more long-standing the agency's interpretation of a statute without amendment by the Legislature, the more likely that the agency's interpretation reflects the Legislature's intent.")

In sum, the Court defers to the Physical Therapy Board's conclusion that dry needling is within the scope of the practice of physical therapy. As such, no reasonable jury could conclude that Defendants have or will practice the unauthorized practice of medicine without a license and Plaintiff therefore is not entitled to injunctive relief under § 61-6-22.

### III. MOTION TO DISMISS

As noted earlier, following the Court's order requesting explanations showing why the Court should not dismiss the case, the Kinetacore Defendants counterclaimed two violations of

the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. *See* Doc. 38. NMSAAM responded to the Court's show cause order by indicating that it sought to permanently enjoin Kinetacore from engaging in the future practice of dry needling and to join Kinetacore's customers as defendants in the lawsuit, naming them as "Jane and John Does." Doc. 21 at 2. Should the case proceed to discovery, NMSAAM said, it "expect[ed] to add one or more of these unnamed defendants by name." *Id*.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Kinetacore's complaint alleges that NMSAAM violated both of these statutory provisions by: (1) threatening to join Kinetacore's customers as defendants in this lawsuit, since the threat of a lawsuit could deter interested dry needling course participants from attending Kinetacore's seminars; (2) burdening Kinetacore with excessive litigation in order to eliminate competition from Kinetacore in New Mexico and thereby obtain monopoly power over the market for filiform needle-based therapeutic services; (3) maintaining this lawsuit for anticompetitive purposes beyond the denial of its motion for a temporary restraining order and a preliminary injunction.

Kinetacore alleges that NMSAAM's anticompetitive intent is revealed in comments from NMSAAM's annual meeting in which an NMSAAM board member said that "the [physical therapists] are a 'tidal wave' and really trying to take over." Doc. 38, ¶ 8. In response to Kinetacore's antitrust counterclaims, NMSAAM has raised what is called a *Noerr-Pennington*

14

defense, which provides immunity for filing a lawsuit, even if the suit was ultimately unsuccessful. Additional facts and argument will be developed in the following sections.

### A. LEGAL STANDARD

"To overcome a motion to dismiss, a complaint must plead facts sufficient to state a claim to relief that is plausible on its face." *Sylvia v. Wisler*, 875 F.3d 1307, 1313–14 (10th Cir. 2017). The district court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Id.* "[T]he Rule 12(b)(6) standard doesn't require a plaintiff to set forth a prima facie case for each element." *Id.* "[A] claim is facially plausible if the plaintiff has pled factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### B. ANALYSIS

As recognized by the United States Supreme Court, the First Amendment right to petition the government protects the right to bring suit in state and federal courts. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, (1972). Accordingly, the act of filing suit is generally immune from antitrust liability. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 380, (1973). Called the *Noerr–Pennington* doctrine, it provides immunity to defendants "from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757–58 (2014). There is an exception to the *Noerr–Pennington* doctrine: it does not protect "sham" litigation – *i.e.* activity that "is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor." *Id*. The Supreme Court has crafted a two-part inquiry for determining whether the "sham exception" applies, such that the defendant loses its antitrust immunity. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508

U.S. 49, 60 (1993). First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized." *Id.* Only if the challenged litigation is "objectively meritless" may a court proceed to the second part of the inquiry, which entails examining the litigant's subjective motivation to determine "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process." *Id.* at 60–61 (emphases in original). "In other words, the plaintiff must have brought baseless claims in an attempt to thwart competition[] (*i.e.,* in bad faith)." *Octane Fitness, LLC*, 134 S. Ct. at 1757.

The parties devoted substantial briefing to which party carries the burden of proof to show that the *Noerr* defense does or does not apply, necessitating the Court's analysis of that issue. Some courts have held that the *Noerr-Pennington* doctrine functions as an affirmative defense, meaning that the plaintiff is not required to plead facts in its complaint to negate the affirmative defense. *See Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 860 (5th Cir. 2000) ("the *Noerr–Pennington* doctrine should be raised as an affirmative defense."). *But see Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1196 (9th Cir. 2017). Kinetacore believes that since the *Noerr* defense is an affirmative defense, its antitrust complaint need not specifically plead facts negating the defense.

It appears the Tenth Circuit has not addressed the pleading burdens associated with a *Noerr* defense. However, district courts within the Tenth Circuit regularly place the burden of proof on the antitrust plaintiff to show that the defense does not apply. *See Crocs, Inc. v. Effervescent, Inc.,* 248 F. Supp. 3d 1040, 1054 (D. Colo. 2017); *Lala v. Frampton*, No. 07-cv-

16

02144-MSK-CBS, 2008 WL 4059874, at *6 (D. Colo. Aug. 28, 2008) ("Once the *Noerr-Pennington* doctrine is invoked by the Defendants, the burden is on the Plaintiff to show that it does not apply.") (citing *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F.Supp.2d 1042, 1053 (D. Kan. 1999)) ("The *Noerr-Pennington* doctrine is more than 'merely an affirmative defense' because once defendants assert it, plaintiffs bear the burden of proving that it does not apply … [t]he doctrine is a defense, which once asserted by defendants, plaintiffs must defeat.") Keeping with district courts within the Tenth Circuit, the Court finds that because NMSAAM, the antitrust defendant, has asserted the *Noerr* defense, Kinetacore bears the burden of proof to show that the defense does not apply. Therefore, to survive dismissal, Kinetacore's antitrust complaint must plead facts negating the defense, meaning that the complaint "must include allegations of the specific activities, not protected under the *Noerr-Pennington* doctrine, which [Kinetacore] contends have resulted in an abuse of the judicial process." *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1177 n.8 (10th Cir. 1982).

With this framework in mind, the Court now applies the two-part test identified in *Prof'l Real Estate Inv'rs* and asks whether NMSAAM "[1] brought baseless claims [2] in an attempt to thwart competition," *Octane Fitness, LLC*, 134 S. Ct. at 1757, such that the "sham exception" to *Noerr-Pennington* doctrine applies. *See id.*

i. **Whether NMSAAM's Lawsuit Was Objectively Baseless**

Kinetacore argues strenuously that NMSAAM's lawsuit became objectively baseless after NMSAAM lost its motion for a TRO in February 2017. However, where, as here, "the antitrust defendant [*i.e.* NMSAAM] has lost the underlying litigation, a court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *Columbia Pictures*

17

*Indus., Inc.*, 508 U.S. at 61 n.5. The existence of probable cause to institute a lawsuit – defined as "no more than a reasonable belief that there is a chance that [a] claim may be held valid upon adjudication" – precludes a finding that the antitrust defendant engaged in sham litigation. *Id*. at 62-63. While the question of whether litigation is a sham could be a fact question for the jury, "[w]here, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." *Id*. at 63.

The Court concludes that NMSAAM had a reasonable basis for instituting the entirety of its lawsuit, even if it was unsuccessful on the merits at all stages. Just because NMSAAM did not prevail in this Court does not mean that a reasonably objective litigant in NMSAAM's position could not have expected a favorable outcome. In fact, plaintiffs similarly situated to NMSAAM have prevailed on the merits – and specifically against Kinetacore – in other states, resulting in it being enjoined from conducting seminars in places like Washington and California. Washington's Attorney General and its courts, for example, have determined that physical therapy excludes the practice of dry needling even though Washington's and New Mexico's physical therapy scope-of-practice acts share somewhat similar features. NMSAAM's lawsuit therefore does not represent one in a series of baseless or vexatious lawsuits against Kinetacore. Rather, NMSAAM's suit challenging the Board's determination was at least "arguably warranted by existing law" given that courts elsewhere have concluded that similar plaintiffs bringing similar lawsuits had merit. *See Columbia Pictures Indus., Inc.*, 508 U.S. at 65.

That Kinetacore has and has not prevailed in different states reflects the fact that, as the Nebraska Attorney General opined, jurisdictions are divided on the question of whether dry needling falls within physical therapists' scope of practice. *See* Neb. Op. Att'y Gen. No. 16009, 2016 WL 3682982 at *4 (July 8, 2016). Where there is a division in jurisdictions or courts on a

18

question of law, a lawsuit is typically not objectively baseless. *See Columbia Pictures Indus., Inc.*, 508 U.S. at 64-65 (noting the "unsettled condition of the law" in the circuit courts regarding copyright issue such that a reasonable litigant could have expected a favorable outcome by commencing suit). Moreover, although New Mexico's Board confronted the issue of whether physical therapy includes dry needling 18 years ago, the majority of Attorney General or Physical Therapy Board opinions from other states have only recently confronted the issue, reflecting its "emergent nature." Wash. AGO 2016 NO. 3 (Wash.A.G.), 2016 WL 1612132 at *4. But generally speaking, there still remains little to no case law, statutory history, or interpretive guidance on the issue. And what little interpretative authority there is has resulted in a split in authorities. Even if the New Mexico Board's interpretation of the Act is longstanding, that does not automatically mean that NMSAAM pressed ahead with objectively baseless claims given the generally unsettled character of this area of law. NMSAAM had probable cause to believe that its lawsuit could garner a favorable outcome. Its lawsuit was not baseless.

### ii. Whether NMSAAM Intended to Thwart Competition by Kinetacore

At the second stage of the two-part inquiry derived from *Prof'l Real Estate Inv'rs*, a court asks "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process." 508 U.S. 49 at 60–61. However, a court only proceeds to the second prong if the challenged litigation is baseless. Since the Court found that NMSAAM's lawsuit was not baseless, the Court does not examine the second part of the *Professional Real Estate Investors* inquiry.

**IT IS THEREFORE ORDERED that** NMSAAM's Motion to Dismiss Kinetacore Defendants' Counterclaims **[Doc. 39]** is **GRANTED**. Plaintiff's Motion for Partial Summary

Judgment **[Doc. 40]** is **DENIED**. Defendants' Motion for Summary Judgment **[Doc. 73]** is **GRANTED**.

      **IT IS HEREBY ORDERED** that this case is **DISMISSED** in its entirety.

      **IT IS SO ORDERED.**

                                                                             _____
                                                                    UNITED STATES DISTRICT JUDGE